STEVEN G. KALAR
Federal Public Defender
ELIZABETH FALK
Assistant Federal Public Defender
19th Floor Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant SALAS VALDOVINOS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PEDRO SALAS VALDOVINOS,<br><br>Defendant. | No. CR 19-696- SI<br><br>DEFENDANT PEDRO SALAS VALDOVINOS' SENTENCING MEMORANDUM<br><br>Court:  Hon. Susan Illston<br>Date:   May 15, 2020<br>Time:   1:00 pm |

**INTRODUCTION**

        Mr. Pedro Salas Valdovinos (hereafter, "Mr. Salas") now appears before the Court for sentencing, having pleaded guilty to the three counts charged in the indictment related to the distribution of methamphetamine to a confidential informant. The Probation Officer has recommended a sentence well below the low-end of the applicable Guideline range – 72 months' incarceration. Were it not for the sale of a firearm in this case in tandem with the last

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

methamphetamine sale on October 24, 2019 it is likely the Probation Officer would have recommended the mandatory minimum sentence here.

Mr. Salas fully appreciates the recommendation of Probation Office below the applicable Guideline range and its careful consideration of his case.  Because the Court is charged with imposing the sentence that is *sufficient, but not greater than  necessary*, taking into account all the 3553(a) factors, Salas respectfully submits that the appropriate punishment in this case is the mandatory minimum sentence available to the Court – 60 months of incarceration.  Ordinarily, Mr. Salas understands that this Court would consider the extra year of incarceration recommended by Probation as punishment for selling a firearm along with methamphetamine.  But three factors weigh against such a decision here – Mr. Salas' extremely young age of 21, the impending loss of his lawful immigration status, and the COVID-19 crisis. Because extraordinary times call for special sentencing considerations, Mr. Salas submits that the mandatory minimum sentence is the correct result in the instant case.

## STATEMENT OF FACTS

Mr. Salas was born into a family of 9 children in 1998 in Colima, Mexico, a small colonial city directly east of the port of Manzanillo on the Pacific Ocean.  His parents worked as ranch hands on a cattle farm and were illiterate; his mother Jovita was only 13 when she had her first child.[1]  At 20 years old, she had Pedro; for many years, he was her youngest child and the "baby"

---

[1] Undersigned counsel interviewed Jovita Valdovinos with the assistance of a Spanish speaking interpreter on May 8, 2020 over the telephone.  All facts contained in this Memorandum that are not in the Presentence Report were provided by Mrs. Valdovinos during that interview.  This occurred after Mrs. Valdovinos dropped off the documents contained in the Falk Declaration in support of sentencing to undersigned counsel.  Because Mrs. Valdovinos explained to the undersigned that she is basically illiterate and cannot read or write very well, she would have trouble writing a letter to the Court.

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

2

of the family.  While Mr. Salas' father was alive, the large family ate well and all worked together to take care of the cows for the owner of the ranch that they lived on.

When Mr. Salas was one-year-old, life as he might have known it was altered forever when a group of men came to rob the ranch of cattle and shot Mr. Salas' father Efrain in cold blood while the majority of the children watched from the porch of their home.  As Mrs. Valdovinos describes it, the scene was horrific and none of the children, nor she, really got over it. Mrs. Valdovinos describes herself as falling into a deep depression for several years where she had to work and go through the motions of rearing children, but she "was not herself."  According to Mrs. Valdovinos, the family had to leave the ranch and hide their new residence because the robbers and murderers were eventually tried in court and convicted with the assistance of her testimony.  The family had little money and basically depended on Efrain's brother, Fidel, to support them.  When the robber/murderers were released from custody four years later, Mrs. Valdovinos learned that they were "coming for her" (as she describes it) in retaliation. "Fear of death" herself led Mrs. Valdovinos to hide her 8 oldest children with distant relatives and changed names, and come to the United States with the assistance of Fidel, who had already set up residence here.

As Mrs. Valdovinos explains, she and Pedro arrived in Tijuana and were told by Fidel's sister that their best chance of crossing the border was to split up.  Six-year-old Pedro was placed in a car with people he did not know, who possessed fake papers to for the boy in order to get him across the car line border in San Diego.  After the crossing, the coyotes took Mr. Salas to his uncle's house in Newark.  His mother, in turn, crossed the desert with a group of unknowns and

3

eventually made it through Mexicali.  Her coyote took her to Sacramento where she essentially

worked as a slave in food preparation for 4 months in order to pay off her coyote crossing fees.

Mrs. Valdovinos stressed that this separation from his mother at the age of five

was extremely difficult on Mr. Salas and had life-long repercussions on his mental health.  It was

difficult for her to talk about because to this day, she genuinely believed she needed to leave

Mexico in 2005 to avoid serious harm, and yet she holds personal guilt from not "fighting for her

son" (as she calls it.)  Once Jovita's coyote bill was deemed satisfied through her work in

Sacramento, she came to Redwood City in 2004 and tried to establish a household with which she

could live with Pedro.  Money was very tight, however, and she needed to work long hours to

make ends meet.  Fidel persuaded Jovita that Pedro was better off living with him and his family

because he could support him better.

According to Jovita, Efrain's brother Fidel was financially supportive of her and "good to

Pedro" but also controlling.  He wanted to raise his brother's child and she felt she had to let him

do it.  She felt indebted to Fidel as he had helped her and she did not have the wherewithal to

stand up to him and reclaim custody of her son.  While she visited him in Newark and eventually,

in Redwood City, she could not bond with him as a mother in the way she feels a mother should

have been there.  Moreover, she explained to the undersigned that she had 8 children living with

relatives in Mexico who needed money, and as such, she felt she had to prioritize work over

childcare.

For several years, Jovita felt Pedro was better off with Fidel.  He attended regular school

in Redwood City and although he struggled with ADD, he was well liked and did well

academically.  He also excelled at soccer and played on many youth leagues to wide acclaim.  See

4

Declaration of Elizabeth Falk ("Falk Decl.") at Exhibits D (middle and elementary school

certificates); Exhibit E (soccer photos and certificates); Exhibit F (school photo from 2006, the

year after Mr. Salas arrived to the United States); Exhibit G (photos as a middle-schooler with

cousins and extended family.) Around 2010, however, things became hard for Mr. Salas at his

uncle's family, as he describes in paragraph 61 of the PSR.  Although Mr. Salas did not

personally report the details of his struggles to the Probation Officer, Jovita relayed that it was

Fidel's wife who "destroyed" Pedro.  Through family counseling and therapy, she later learned

that Mr. Salas' aunt never liked having to raise a non-biological son and "always made Pedro feel

like he was a lesser person and not really welcome there."  She further explained that her son

apparently drifted away from the family and sought friendship and camaraderie with

neighborhood boys who were much older and likely, gang members.  This is where, she

explained, he began to learn "the wrong ways."

     Although Mr. Salas did not report it to his Probation Officer, Jovita described an incident

that occurred when Mr. Salas was ten years old and older boys in his neighborhood forced him to

"carry a bag of drugs across the bridge for them."  When Pedro told her about it, she wanted him

to go to the police, but he was too afraid of ramifications and declined to do so.  Jovita further

explained that this was when she started to have doubts that Pedro's family situation was the best

one for him, and started to make a plan to regain custody.  Because Jovita had also involved

herself in a new romantic relationship with a financially stable (albeit, abusive) person, she also

felt for the first time she had the economic grounding to take on this fight.

     Then in 2011, a daughter in Mexico got very sick, prompting Jovita to tell Fidel she was

returning to Mexico and taking Pedro with her to reunite with his family for a few months.  Fidel

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

did not allow her to take Pedro and an ugly internal family battle ensued.  When Jovita returned, she found that Fidel and his wife had filed a proactive complaint with Child Protective Services that she had abandoned her son long ago to their care and she should not be allowed her parental rights.  This is the reason CPS became involved in Mr. Salas' life as the court decided which family member Pedro should live with.  *See* PSR at ¶ 64.

This backdrop undergirded Mr. Salas' involvement with the juvenile justice system at an early age; his first run-in with juvenile hall occurred in 2011, after his mother had returned to Mexico.  According to Mr. Salas, his uncle's wife told him that his mother was abandoning him for good, prompting him to run away from home, seek solace at a friend's house, begin using controlled substances, and engage in petty crime.  *See* PSR at ¶¶ 62, 72-73.  His uncle reported him as a runaway, and CPS got involved, placing Mr. Salas in a group home during juvenile court proceedings while his mother was in Mexico.  Jovita also recounted this situation emotionally, indicating it was very difficult to have to choose between caring for her extremely ill daughter in Mexico versus returning to the United States to fight for her son's freedom.  When she did return to the States, she recounted many difficult meetings she had with CPS where both she and Pedro had to go to therapy and family counseling in order to work through the process of reclaiming custody.

Once Jovita did manage to reclaim custody of Mr. Salas, he unfortunately went to live with her and Juan Jacobo, the boyfriend referenced above who turned out to be an alcoholic abusive bully.  The abuse persisted, and escalated into an incident where Jovita was choked and almost killed by Jacobo.  *See* PSR at ¶ 64.  During this last incident, Mr. Salas had to intervene to help his mother; the police got involved, and Mr. Jacobo was prosecuted and deported.  Id.  While

6

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

this series of events did result in legal status for Jovita and Pedro in the form of a U-Visa, it also nearly put the family out on the street because Jacobo had been the main breadwinner for the household.

From these events, which relay a childhood of significant trauma, Mr. Salas began acting out his emotional problems.  He self-medicated with illicit drugs, which in turn fueled his involvement with the juvenile justice system.  He cycled through juvenile hall, yet never gave up on his education and persisted in engaging in gainful activities to better himself.  For example, after being convicted of two juvenile offenses in early 2016, Mr. Salas went on to earn numerous certificates in juvenile law prevention programs and vocational trainings.  *See* Falk Decl. Exhibit C.  He also persisted in his education, even managing to win a San Mateo county poetry contest while he completed the eleventh grade.  *Id.* at Exhibit B.  Although he had trouble in high school, it was never academic, as he graduated from high school six months ahead of schedule.  *See id.* at Exhibit A.  These achievements are significant for an individual who has battled ADD his entire life and who has lived in and out of group homes and in juvenile hall.  As much as this case demonstrates a side of poor decision making and illegal behavior in Mr. Salas, there is much good and promise in him as well.

According to Mrs. Valdovinos, she believes Mr. Salas made the poor decision to sell contraband after his delivery van was stolen, crashed and towed in 2018.  Prior to that, she reports he was making a decent living as a delivery driver and was helping her out to pay household expenses and to support his littler half-siblings.  *See* PSR at ¶ 81.  Mr. Salas reports that he did not want to turn to his mother for money to attend college courses and although he wanted to obtain training as an electrician, he did not know anyone who could help get him into a union.  His

7

actions in this case were therefore economically driven and the result of an impulsive, poorly reconciled juvenile thought process.  The consequences he now faces match the severity of the conduct; a term of adult, federal prison of at least 5 years and almost certain deportation to a country he has never known, away from the only family he has known in the United States.

## ARGUMENT

### I.   A SENTENCE OF 60 MONTHS IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO FULFILL THE GOALS OF 18 U.S.C. § 3553(a)

In sentencing Mr. Valdovinos, this Court must consider *all* of the directives set forth in 18 U.S.C. section 3553(a); the sentencing guidelines are only one factor among many to be considered by the Court.  *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).   "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of section 3553(a).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted).  Those goals include the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a)(2).  Section 3553(a) also directs the court to consider a number of additional factors, including the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and, the need to provide restitution to any victims of the offense, § 3553(a)(7).

In this case, in consideration of all of the factors under section 3553(a), the reasonable and appropriate sentence is 60 months of imprisonment.   In support of the requested sentence,

8

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

Mr. Valdovinos specifically argues as follows:

- • Mr. Valdovinos, at 21 years old, is extremely young.  He was only 20 when these offenses occurred, has never served any adult prison sentence or any significant jail sentence before, and his actions must be viewed in the context of his traumatic childhood experience;

- • The Court should consider, that as additional punishment beyond incarceration, Mr. Salas will lose his U Visa lawful immigration status while he serves this sentence and now, with this conviction, will be forever barred from applying for legal permanent resident status, as his mother is currently doing.  He will be also be deported immediately following the completion of this sentence, which is perhaps the most significant consequence of Mr. Salas' actions in this case and a reality he has yet to fully grasp;

- • The Court must also consider the reality that Mr. Salas will serve his sentence during the current national pandemic which is starkly affecting BOP's regular operations.  Simply put, COVID-19 prison time is the very hardest time and the absolute worse time to be incarcerated by the BOP, and it is readily apparent that a shorter sentence during COVID-19 will make a much stronger imprint on a 21 year old defendant's mind like Mr. Salas' than a much longer sentence during normal times.

When all the aforementioned circumstances are considered by the Court, it becomes apparent that the fair and just result in this matter is a sentence of 60 months in custody.

//

//

9

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

## I.    THE COURT SHOULD VARY DOWNWARD TO 60 MONTHS OF INCARCERATION BECAUSE OF MR. VALDOVINOS' AGE, RECORD AND HIS BACKGROUND

The first important consideration that sets this case apart from other undercover meth-and-gun sales cases is Mr. Salas' age.  While he was 20 years old at the time he committed the charged crimes, this Court should still recognize him as closer in mindset, maturity and sophistication to a juvenile offender than an adult – and he should be punished accordingly. These crimes arose from Mr. Salas' sense of urgency that he needed to make fast money to continue his educational and life goals after his delivery van suffered a break-in and was towed. The poor decision making and flawed "risk-reward" ratio perception that influenced Mr. Salas to commit these crimes are directly connected to his age, and will likely recede as time passes regardless of the sentence this Court selects here.  Quite simply, younger defendants like Mr. Salas should be given an opportunity to outgrow the mindsets that influenced them to commit crime before a lengthy incarceration term is imposed.

This is particularly true in Mr. Salas' case, as he has never served a sentence of longer than 29 days in custody and has therefore not been previously been in a position where he had to reconcile his behavior and its consequences.  When juxtaposed against the obstacles Mr. Salas faced as a youth, including his father's death, his mother's absence, his adoptive family's rejection and the neighborhood pressures that encouraged him to head down the wrong path, it becomes clear that Mr. Salas' developing brain was operating on overload at the time he decided to commit the instant offenses.  He has now had time to reflect in custody on the intersection of all these factors and is determined to reprogram himself for future law-abiding behavior.  His academic record suggests that he has the tools to make those changes – and the Court should consider the mandatory minimum sentence an adequate incentive for him to do so.

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

The Supreme Court has repeatedly distinguished an adolescents' culpability from that of an adult. *Miller v. Alabama,* 132 S. Ct. 2455, 2464 (2012); *Graham v. Florida,* 560 U.S. 48, 76 (2010); *Roper v. Simmons,* 543 U.S. 551, 569 (2005). None of the factors distinguishing adolescent culpability are crime specific. *Miller,* 132 S. Ct. at 2465. The same concerns noted by the Court over juvenile death and life-without-parole sentences, are also present, to the same degree over other lengthy sentences.[2] Moreover, although the Supreme Court in the aforementioned cases was discussing juvenile offenders, the Court is undoubtedly aware that there is a growing call and trend to treat young adult offenders as a distinct category given that psychological and neurological development continues into the mid-twenties. *See* Josh Gupta-Kagan, *The Intersection Between Young Adult Sentencing and Mass Incarceration*, 2018 Wis. L. Rev. 669, 674-92 (2018).

The Supreme Court recognizes three factors reducing adolescents' culpability, (1) a lack of maturity and underdeveloped sense of responsibility often resulting in impetuous decision-making; (2) adolescents are more susceptible to negative influence through peer pressure; and, (3) adolescents' character is more transitory than that of an adult. *Roper*, 543 U.S. at 569-70. These factors are supported by both neuroscience and developmental psychology.[3] Developmental

---

[2] *See e.g.* David 0. Brink, *Immaturity, Normative Competence, and Juvenile Transfer: How (Not) to Punish Minors for Major Crimes,* 82 Tex. L. Rev. 1555 (2004), available at http://davidobrink.com/sites/default/files/publications/ImmaturityNormativeCompetenceJuvenileTransfer.pdf; Barry C. Feld et. al., *Adolescent Competence and Culpability: Implications of Neuroscience for Juvenile Justice Administration,* in Stephen Morse & Adina Roskies, eds., *A Primer on Criminal Law and Neuroscience* (New York: Oxford University Press, 2013), at 183 ("Feld, *Adolescent Culpability")* available at http://www.oxfordscholarship.com/view/10.1093/acprof:oso/9780199859177.001.0001/acprof-9780199859177-chapter-7

[3] *See e.g.* Feld, *Adolescent Culpability;* Elizabeth S. Scott & Laurence Steinberg, *Blaming Youth,* 81 Tex. L. Rev. 799, 811-19 (2003) ("Scott & Steinberg, *Blaming Youth").*

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

psychologists agree with the Court that differences between adult and adolescent decision-making should translate into differences in sentencing.[4]

### A. Impulsive Decision Making

The Supreme Court notes that "children have a 'lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking." *Miller*, 132 S. Ct. at 2465 (quoting *Roper*, 543 U.S. at 569). A plethora of developmental psychology studies have noted adolescents' deficiency in rational decision making.[5] These studies confirm adolescents have a strong tendency to over-value rewards and under-value risk when making decisions.[6] Differences in adolescent decision-making and risk assessment are partially attributable to discrepancies in the brain itself.[7]

Data generated from MRI scans has tracked the growth and eventual pruning of gray matter (cell dense material associated with cognition) in the human brain, as well as the amount of white matter (nerve dense material connecting brain regions).[8] Changes in the ratio of gray and white matter begins at puberty and is used by scientists as a measure for neural maturity.[9] This maturation process is not uniform across the brain, it begins in the parietal region, and

---

[4] Scott & Steinberg, *Blaming Youth* at 839--40.

[5] Elizabeth Cauffman & Laurence Steinberg, *(Im)maturity of Judgment in Adolescents: Why Adolescents May Be Less Culpable Than Adults,* 18 Behav. Sci. & the L. 741, 744 (2000); Beatriz Luna & Charles Geier, *The Maturation of Incentive Processing and Cognitive Control* 93 Pharmacology, Biochemistry & Behavior 212, 218 (2009); Bernard Finger et. al., *Affective and Deliberative Processes in Risky Choice: Age Differences in Risk Taking in the Columbia Card Task,* 35 J. of Experimental Psycho: Learning, Memory and Cognition 709, 728.

[6] Feld, *Adolescent Culpability* at 192.

[7] Feld, *Adolescent Culpability* at 188-194; Laurence Steinberg, *A Behavioral Scientist Looks at the Science of Adolescent Brain Development,* 72 Brain & Cognition 160, 160 (2010).

[8] Miya R. Asato et. al., *White Matter Development in Adolescence: A DTI Study,* 20 Cerebral Cortex 2122, 2122 (2010); Elizabeth Sowell et. al., *Mapping Changes in the Human Cortex Throughout the Span of Life,* 10 The Neuroscientist 372, 374-75 (2004).

[9] *Id.*

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

ends at the frontal region during early adulthood.[10] Since the prefrontal cortex is the region of the brain most associated with reasoning and decision-making, its late development explains some of the delay between adult cognitive ability and mature decision-making.[11]

The development of the MRI scan allows scientists to map neural activity across the brain's regions and reveal functional differences between adults and adolescents when making decisions. In both adolescents and adults, the ventral striatum is strongly associated with considering reward, while the prefrontal cortex has a strong association with the cognitive control associated with decision optimization.[12] Neuroimaging has revealed that when faced with a risky decision, adolescent's ventral striatum shows greater activity than an adult's.[13] Conversely, adolescents show a more diffused response in the prefrontal cortex than adults.[14] At a neurobiological level, adolescents accordingly present a greater response to reward, and a lessened capacity for decision optimization.[15]  Mr. Salas' actions in this case as a 20 year old mirror this kind of impulse; a five year sentence would result in his release to the community at 25 years old and an age where his brain has largely outgrown these impulses.

**B.  Increased Risk of Negative Peer Influence**

The Supreme Court has noted "that juveniles are more vulnerable or susceptible to

---

[10] Peter R. Hurtenlocher & Arun S. Dabholkar, *Regional Differences in Synaptogenesis in Human Cerebral Cortex,* 387 J. of Comp. Neurology 167, 177-78.

[11] Feld, *Adolescent Culpability* at 189-90; Laurence Steinburg, *Risk Taking in Adolescence: New Perspectives from Brain and Behavioral Science,* 16 Current Directions in Psychol. Sci. 55, 57-58 (2007).

[12] Feld, *Adolescent Culpability* at 191. Sarah Durston et. al., *A Shift From Diffuse to Focal Cortical Activity With Development,* 9 Devel. Sci. 1, 5 (2006); Vinod Venkatraman et. al., *Separate Neural Mechanisms Underlie Choices and Strategic Preferences in Risky Decision Making,* 62 Neuron 593, 597-599 (2009).

[13] Feld, *Adolescent Culpability* at 191-192; Venkatraman et. al., *supra,* at 599.

[14] Durston et. a1. at 5.

[15] Feld, *Adolescent Culpability* at 191-192; Venkatraman et. al., *supra;* Durston et. al., *supra,* at 5.

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569

(citing *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982)). What the Supreme Court saw as a

common-sense notion, is robustly supported by developmental psychology.[16] Adolescents are

much more likely than adults, to commit crimes in groups.[17] Studies confirm that the mere

presence of peers causes adolescents to engage in riskier behavior.[18] Older peers play an

especially insidious role in leading adolescents to criminal activity.[19]

　　　　As with risk taking, adolescent vulnerability to peer influence has also been confirmed by

neuro-science.[20] In both adults and adolescents, the amygdala is involved in deciphering the

emotional significance of social cues, while the ventromedial prefrontal cortex is involved in

social processing.[21] Neural imaging studies have shown that, in comparison to adults,

adolescents have a higher amygdala recruitment and under-recruitment of the ventromedial

prefrontal cortex.[22] In other words, the adolescent brain overreacts to social stimuli while it has

a reduced mechanism for processing these same stimuli.

---

[16] Laurence Steinburg & Kathryn C. Monahan, *Age Differences in Resistance to Peer Influence,* 43 Devel. Psychol. 1531, 1541 (2007); Nat'l Research Council, Comm. On Assessing Juv. Just. Reform, *Reforming Juvenile Justice: A Developmental Approach* 94(Richard J. Bonnie et. al., eds. 2013) at (hereinafter, *A Developmental Approach).*
[17] *A Developmental Approach* at 94.
[18] Margo Gardner & Laurence Steinberg, *Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study,* 41 Developmental Psychol. 626, 626-630 (2005).
[19] David J. Harding, *Violence, Older Peers, and the Socialization of Adolescent Boys in Disadvantaged Neighborhoods,* 74 Am. Sociol. Rev. 445, 458 (2009); Jonathan Goldner et. al., *Exposure to Community Violence and Protective and Risky Contexts Among Low Income Urban African American Adolescents: A Prospective Study,* 40 J. Youth and Adolescence 174, 178 (2011).
[20] Feld, *Adolescent Culpability* at 193; Amanda E. Guyer et. al. *Amygdala and Ventrolateral Prefrontal Cortex Function During Anticipated Peer Evaluation in Pediatric Social Anxiety,* 65 Arch. Gen. Psychiatry 1303. 1307 (2008).
[21] *Id.*
[22] Feld, *Adolescent Culpability* at 193; Todd A. Hare et. al., *Biological Substrates of Emotional Reactivity and Regulation in Adolescence During an Emotional Go-Noga Task,* 63 Biological Psychiatry 927, 932 (2008); Guyer et. al., *supra.*

14

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

Part of Mr. Salas' actions in this case involve his response to neighborhood norms and the older individuals in his neighborhood who used him to run drugs when he was only 10 years old.  Over time, he will mature and grow less susceptible to social influence.  Again, a lengthy term of incarceration is not going to hasten this process along – and this Court should allow Mr. Salas an opportunity to mature and develop short of a substantial custodial sentence beyond the mandatory minimum.

### C.  Identity

The Supreme Court recognizes that the most important distinction between adolescents and adults, is the ability to grow; "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'' *Roper*, 543 U.S. 551, 570 (2005) (quoting *Johnson v. Texas,* 509 U.S. 350, 368 (1993)). Developing one's own separate identity through experimentation and novelty-seeking behavior is a key feature of adolescence.[23] Research shows that the vast majority of adolescent offenders will not reoffend in adulthood.[24] This trend holds true with serious and violent adolescent offenses.[25] Adolescents are both receptive to intervention and may simply grow out of their criminal careers.

---

[23] *A Developmental Approach* at 90.

[24] *A Developmental Approach* at 90; *See e.g.* Terry E. Moffit, *Adolescence-Limited and Life-Course-Persistent Antisocial Behavior,* 100 Psych. Rev. 674 (1993); Howard N. Snyder, *Appendix Serious, Violent and Chronic-An Assessment of the Extent of and Trends in Officially Recognized Serious Criminal Behavior in a Delinquent Population,* in Rolf Loeber & David F. Farrington eds. *Serious & Violent Juvenile Offenders,* (SAGE Publications, Thousand Oaks CA, 1998) at 442-43 ("Snyder, *Appendix").*

[25] Snyder, *Appendix,* at 442.

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

In this case, the Court must impose a mandatory minimum sentence of 60 months, and this is still a lengthy term of incarceration that will give Mr. Salas plenty of time to re-evaluate the failures of his decision making.

**II.    THE COURT SHOULD FURTHER VARY TO THE MANDATORY MINIMUM SENTENCE BECAUSE MR. SALAS WILL LOSE HIS LAWFUL STATUS WHILE INCARCERATED AND WILL BE FOREVER DEPORTED FROM THE UNITED STATES WITH NO POSSIBILITY OF LAWFUL RE-ENTRY**

No matter what sentence this Court selects, there is no custodial period that is greater punishment than the loss of Mr. Salas' immigration status.   Through no decision or fault of his own, Mr. Salas came to this country as a six-year-old and obtained lawful status through a U-Visa because he and his family are victims of crime.  *See* PSR at p. 16 n.1.  A U visa, however, is not a permanent lawful status; U Visas expire and Mr. Salas' will expire in January 2021.  The only path forward to continued lawful presence in the United States from a U Visa is an Adjustment of Status petition (Document I-485), whereby the U-Visa recipient seeks to adjust to Legal Permanent Resident status.  Because Mr. Salas will be incarcerated at the time his U-Visa expires, he cannot apply for LPR status because he will not be out of custody to complete the requisite documents, undergo the necessary medical examination or make the necessary interviews.  Even if he could apply, a Title 21 conviction under the federal code is an absolute bar to adjustment as a Legal Permanent Resident because it is considered an aggravated felony and a drug trafficking offense.

It is thus a foregone conclusion that Mr. Salas' most severe consequence in this case will be the loss of lawful status and a permanent inability to apply for lawful status in the United States.  He will be deported upon conclusion of this sentence and must return to Mexico.  The only family Mr. Salas has – and these are family members he has never met –

16

live in Colima, one of the 5 states in Mexico that the U.S. State Department has issued a Level 4 "do not travel" advisory for.  *See* U.S. Department of State, Travel Advisories available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (last visited May 9, 2020).  Crime is rampant in the state of Colima and at 25 years old, Mr. Salas will be in a tough position to get established there.

While it is unlikely that Mr. Salas gave deep thought to the potentially grave immigration consequences of this crime at the time he committed it, he certainly is focused on it now and is exceedingly regretful he did not appreciate the delicate nature of his immigration situation before.  He has always enjoyed legal status, and the United States is the only country he knows as home.  The instant offense is Mr. Salas' only disqualifying offense; up until November 2019, he anticipating adjusting status with his mother to that of legal permanent resident.  Now, that opportunity and life in this country has been lost.  This Court should consider the entire picture of Mr. Salas' punishment when deciding on the appropriate sentence.  This is another reason that the 60 month mandatory minimum, in concert with immigration penalties, suffices.

## III.    THE COURT SHOULD ALSO VARY BECAUSE A 60 MONTH SENTENCE IS SUFFICIENT IN LIGHT OF THE COVID-19 PANDEMIC

In addition to the factors listed above, this Court must also consider the prudence of sentencing Mr. Salas to a longer custodial term than 60 months in light of the current COVID-19 pandemic.  Such consideration is warranted under section 3553(a) (e.g., the need to provide *just* punishment; the need to provide needed medical treatment; the kinds of sentences available).

As of May 9, 2020, the new strain of coronavirus which causes COVID-19, has infected over 3.9 million people, leading to at least 274,826 deaths worldwide.[26] On March 11, 2020, the

---

[26] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (April 24, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

World Health Organization officially classified COVID-19 as a pandemic.[27] Governor Newsom

declared a State of Emergency and all six Bay Area counties have been under a shelter in place

order for six weeks. As of May 9, 2020, there are a total of 64,992 positive cases and 2,679

deaths in California.[28] As of May 9, 2020, there are 1,890 positive cases and 33 deaths in the city

of San Francisco and 1,982 positive cases and 72 deaths in Alameda County, where the jail is

located.[29] The numbers are rising exponentially. With confirmed cases in San Francisco and the

entire Bay Area that indicate community spread, we must take every necessary action to protect

vulnerable populations and the community at large.

The Bureau of Prisons has currently suspended all prisoner transit to designated facilities,

and social visits have been suspended.[30]  It is unclear when prisoner transit will resume; as

such, Mr. Salas may end up serving a large portion of his sentence in the Santa Rita Jail.  Even

if Mr. Salas is transferred to BOP, conditions in federal prison are also grim.  As of May 9,

2020, there were 3701 inmates and 527 BOP staff members infected, and 45 inmates have

died.[31]  The Department of Justice (DOJ) and DOJ Inspector General are conducting

investigations into facilities where inmates have died, including at Lompoc, California, where

dozens of inmates and staff members tested positive.[32]  Defense counsel has spoken with

former clients at BOP facilities who confirm that inmates are scared and unable to distance or

---

[27] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.

[28] *Coronavirus in California: Map and Case Count*, The New York Times (April 24, 2020), *at* https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html (updated regularly).

[29] *Id.*

[30] BOP, BOP Implementing Modified Operations (May 8, 2020), *at* https://www.bop.gov/coronavirus/covid19_status.jsp.

[31] BOP, COVID-19 Cases (April 23, 2020), *at* https://www.bop.gov/coronavirus/.

[32] *DOJ Team Reviewing Conditions at Virus-Plagued Federal Prisons; IG leading Separate Probe*, USA Today (April 16, 2020), *at* https://www.usatoday.com/story/news/politics/2020/04/16/doj-launches-review-prison-virus-deaths-infections-mount/5144320002/.

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

otherwise protect themselves.  Many institutions have inmates on lockdown for the majority of
the day, which precludes participation in educational programming such as RDAP or other
programs that allow inmates to earn credits against their sentences.  Indeed, it is likely that any
inmate sentenced to BOP custody during the pandemic will serve the full 85% of their
sentence, simply because the BOP cannot afford to put inmates in close contact to attend group
programming.  This means Mr. Salas will be forced to serve even more—and "harder"—time
than he would if we were not in a worldwide pandemic.  This reality alone more than justifies
this Court's decision to sentence Mr. Salas to the mandatory minimum sentence, and no more.

The situation is even worse in the jails, including Santa Rita jail.  Conditions of
confinement create the ideal environment for the transmission of contagious disease.[33] Public
health experts around the world, and particularly in California, are urging the release of
individuals from custody to assist in reducing the spread of the virus.[34] An opinion piece in the
New York Times describes these unique and pressing issues.[35] Inmates cycle in and out of
detention facilities from all over the world country, and people who work in the facilities
including correctional officers, and care and service providers leave and return daily, without
screening. Incarcerated people generally have poorer health than the general population, and
even at the best of times, medical care in custody is (at best) limited.[36] Many people who are
incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to

[33] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[34] *CA Public Health Experts Urge Gov. Newsom to Release Elderly and Medically Vulnerable Populations from Prisons, at* https://medium.com/@lee.riley/ca-public-health-experts-urge-gov-newsom-to-release-elderly-and-medically-vulnerable-from-prisons-f41ed7cdbc7f
[35] *Our Courts and Jails Are Putting Lives at Risk*, Emily Bazelon, New York Times, March 13, 2020, *at* https://www.nytimes.com/2020/03/13/opinion/coronavirus-courts-jails.html?searchResultPosition=1.
[36] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

19

severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[37] Outbreaks of the flu regularly occur in jails and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[38]

At Santa Rita jail there have been forty positive cases of coronavirus (thirty-eight inmates and two staff/contractors) as of May 8, 2020.[39] An additional ten individuals are labeled "red," meaning they are displaying symptoms consistent with COVID-19, and 7 additional pods (with an unknown number of individuals) are quarantined and labeled "yellow," meaning they have had contact with known or suspected COVID-19 or have a high risk travel history. *Id*. Inmates remain in tight quarters even with the counties' recent release of certain inmates. *Id*. Access to personal hygiene items is limited with only those inmates that have certain means able to purchase commissary (better/more soap and other hygiene items). While the jail has provided each inmate with a mask and one additional bar of soap, which inmates have reported is not always happening, it is hardly enough to protect the population. Additionally, the jail has now restricted all visits to the jail. No family, friends or even experts are allowed into the jail. *Id*.

The situation in jails and prisons is dire. The ACLU projects a dramatic increase in projected deaths in jails if we continue to operate jails as usual and fail to reduce the jail population.[40] The release of non-violent defendants, such as Mr. Salas, is widely recognized as

---

[37] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.
[38] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.
[39] Alameda County Sheriff's Office COVID-19 update, https://www.alamedacountysheriff.org/admin_covid19.php (April 24, 2020).
[40] *COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails*, *at* https://www.aclu.org/sites/default/files/field_document/aclu_covid19-jail-report_2020-8_1.pdf.

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

the quickest and least controversial means of reducing jail populations.[41] However, in the instant case, Mr. Salas' plea agreement with the government –which he entered into before the pandemic was apparent – precludes him from requesting post-plea release from this Court.  He has no remedy but to serve his sentence at the height of the pandemic -- and there can be little doubt that the service of any sentence during this time of heightened risk will make a much stronger impression upon an intelligent defendant than a longer sentence would under normal circumstances.  For the last several weeks, for example, Mr. Salas' specific unit has been under quarantine and he has seen numerous inmates become sick and symptomatic with COVID-19. He lives in fear of contracting the disease and must now sit in the jail knowing he is powerless to control his own body and keep himself safe – he must live in the confines of incarceration where his fate is truly in the hands of correctional guards and sheriffs who do not know him personally and have no vested interest in his health.  This reality alone has made more of an impression on Mr. Salas than any length of time this Court could impose for his crimes.

Even without the COVID-19 pandemic, a mandatory minimum sentence is appropriate here. With the addition of that issue, it is all the more imperative to keep the sentence as short as the law allows.  This is an exceptionally difficult to time to serve a sentence.  Time served now is much harder than time served under normal circumstances and conditions are not likely to change anytime soon.  Thus, a multi-month sentence imposed now should be considered a much harsher sanction than it would normally be.

In view of all this, Mr. Salas respectfully asks the Court to consider a significant downward variance.  Given the circumstances, additional custodial time is not necessary to mete out sufficient punishment, consistent with the mandate of § 3553(a).  The COVID-19 pandemic must be taken into consideration, and as such, the mandatory minimum sentence is appropriate.

---

[41] *No One Deserves to Die of Covid-19 in Jail*, New York Times, April 24, 2020, *at* https://www.nytimes.com/2020/04/23/opinion/coronavirus-prisons.html.

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO

21

**CONCLUSION**

For the foregoing reasons, Mr. Pedro Salas Valdovinos respectfully requests that the Court sentence him to 60 months in custody, 4 years of supervised release and a $300 special assessment.

DATED: May 9, 2020                                 Respectfully submitted,

                                                   STEVEN G. KALAR
                                                   Federal Public Defender


                                                   ELIZABETH FALK
                                                   Assistant Federal Public Defender

22

*U.S. vs. Valdovinos*, 19-696 SI
DEF SENT. MEMO